PINKIE PANKEY, Respondent, v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY. Appellant.

Kansas City Court of Appeals, May 18, 1914.

1. **NEGLIGENCE:** Railroads: Structures Near the Track: Freight Platforms: Servants. A brakeman engaged in switching cars, after giving a "slow" signal to the engineer to back up and couple to some standing cars, left a point on the main track where he could be seen by the engineer and walked out of the line of the latter's vision over to where the coupling was to be made on a side track some 40 feet or more away, and placed himself on the track in front of the backing car and between it and the car to be coupled. On one side of the track was a freight platform the top of which was about level with the bottom of an ordinary freight car This platform was of the same height and distance from the track as all other freight platforms, and, like all others, was too close to allow employees to go or stand between the platform and passing cars, and they were never required to go between them. On the other side of the track there was nothing to injure the brakeman. When the cars to be coupled were about twenty feet apart the conductor, standing near, saw the brakeman's dangerous situation and called to him to "get out of there." The brakeman, instead of stepping to the side where no obstructions were to endanger him, went to the platform, placed his lantern on it and attempted to vault upon the platform out of danger. Before he could do so the backing car caught him and crushed him between the car and the platform: *Held* that there was no negligence shown in the erection or maintenance of the platform, nor any other negligence on the

part of the defendant, and, as the injury was caused solely by the negligence of the brakeman, there could be no recovery.

2. ———: ———: ———. While it is the master's duty to see that no structures are erected so close to the track as to injure servants where they may be expected to rightfully be in the discharge of their duties, yet this does not require the master to place the structures so far from the track that a servant cannot be injured thereby even though he negligently place himself where he has no right to be. The test of the company's negligence will be whether the structure is dangerous to employees when they are exercising ordinary care and in the line of their duty.

3. PRACTICE: Procedure: Case under Federal Employer's Liability Act Not Removable. By the express terms of the Federal Employer's Liability Act, no case arising thereunder, and brought in a state court of competent jurisdiction, can be removed to the federal court. And this applies even in cases where, by reason of diversity of citizenship, such right of removal would otherwise exist.

Appeal from Chariton Circuit Court.—*Hon. Fred Lamb,* Judge.

REVERSED.

*Thos. R. Morrow, James A. Collet, Geo. J. Mesereau* and *John H. Lathrop* for appellant.

(1)   There was no negligence shown on the part of the defendant under the first ground of negligence. Williams v. Railroad, 233 Mo. 666; Boyd v. Harris, 176 Pa. 484, 35 Atl. 222; Elliott v. Railroad, 204 Mo. 1; Coin v. Lounge Co., 222 Mo. 488.   (2)   There was no negligence shown on the part of the defendant under the second ground of negligence.   Shields v. Railroad, 87 Mo. App. 637; Boyd v. Graham, 5 Mo. App. 403; Adams v. Ins. Co., 76 Pa. St. 411; Hinton v. Coleman, 45 Wisc. 165; Power v. Kane, 5 Wisc. 265; Sweet v. Leach, 6 Ill. App. 212; In The Harbinger, 50 Fed. 941; Ins. Co. v. Nieberger, 74 Mo. 167; Lee v. Railroad, 195 Mo. 400; Railroad v. Lindeman, 143 Fed. 946.   (3) Even though defendant had failed to follow the practice

of stopping when the light disappeared, still Thomas Pankey knew of defendant's alleged failure to follow such rule or practice and knew of its failure, if any, at this very time. He therefore assumed all risks therefrom and plaintiff cannot recover. 1 Bailey's Pers. Ing. Relating to Master and Servant, Secs. 504, 505, p. 175; 14 Am. & Eng. Ency. Law (1 Ed.), 845; 20 Am. & Eng. Ency. Law (2 Ed.), 118; 3 Elliott on Railroads, Secs. 1282, 2030; Bradley v. Railroad, 138 Mo. 293; Hager v. Railroad, 207 Mo. 302; Berning v. Medart, 56 Mo. App. 443; Railroad v. Williams, 39 S. W. (Tex.), 967; Portance v. Coal Co., 77 N. W. (Wis.), 875; Bonnett v. Railroad (Tex. Civ. App.), 31 S. W. 525; Bonnett v. Railroad, 33 S. W. 334; Seldonridge v. Railroad, 46 W. Va. 569, 33 S. E. 293; Hughes v. Railroad, 27 Minn. 137, 6 N. W. 553. (4) Thomas Pankey was guilty of negligence which was the sole cause of the accident. Moore v. Railroad, 146 Mo. 572; Hurst v. Railroad, 163 Mo. 309; Railroad v. Bivins, 103 Ala. 142, 15 So. 515; Railroad v. Orr, 91 Ala. 548, 8 So. 360; Railroad v. Holborn, 84 Ala. 133, 4 So. 146. (5) The presumption of due care cannot apply in a case of this kind where the physical facts and the evidence shows conclusively that the deceased could not have been at the time using any care at all. Spiva v. Coal & Mining Co., 88 Mo. 68; Mockwick v. Railroad, 196 Mo. 550; Higgins v. Railroad, 197 Mo. 300; Adair v. Mettie, 156 Mo. 496. (6) Thomas Pankey was negligent in failing to observe the rules of the company and by reason thereof he assumed all risks flowing from and due to his failure to observe such rules. 26 Cyc., p. 1157; Reagan v. Railroad, 93 Mo. 348; Schaub v. Railroad, 106 Mo. 74; Francis v. Railroad, 110 Mo. 387; Matthews v. Railroad, 227 Mo. 241; Finnegan v. Railroad, 149 S. W. 612; Van Camp v. Railroad, 141 Mo. App. 344.

*Phillips & Phillips* and *Gilbert Lamb* for respondent.

(1)   There was negligence in having the platform dangerously near the track.   George v. Railroad, 225 Mo. 364; Murphy v. Railroad, 115 Mo. 125; Charlton v. Railroad, 200 Mo. 437; Hemmingsen v. Railroad, 114 N. W. 785; 2 Labatt on Master and Servant, p. 2611; Clay v. Railroad, 115 N. W. 949. (2)   Plaintiff is not barred by contributory negligence or assumption of risk.   Hardwick v. Railroad, (not reported); Mondou v. Railroad, 223 U. S. 1; Delo v. Mining Co., 160 Mo. App. 38; Burkehead v. Rope Co., 217 Mo. 48; Schiller v. Breweries Co., 156 Mo. App. 569; Railroad v. Sanders, 46 N. E. 799; McMurry v. Railroad, 225 Mo. 272; Jewel v. Bolt & Nut Co., 231 Mo. 176.   (3)   It was negligence for the engineer to back his train after deceased's light disappeared, under the circumstances of the case.   Railroad v. Pearcy, 131 S. W. 1036; Schus v. Powers Co., 69 N. W. 68.

TRIMBLE, J.—Between three and four o'clock in the morning of November 27, 1910, Thomas Pankey, the head brakeman on one of defendant's freight trains engaged in interstate commerce, was killed at Floyd, Missouri, by being crushed between a car and the freight platform of the depot.

This suit was brought in the circuit court of Chariton county, Missouri, under the Federal Employer's Liability Act, by his administratrix, Pinkie Pankey, for the benefit of herself as his widow and his one child, Mary L. Pankey, an infant three weeks old at the time of the father's death.

Defendant is a Kansas corporation, and plaintiff a resident of Linn county, Missouri.   A petition and bond for removal to the Federal court were filed by defendant in due form' and time, but the trial court refused to order the case removed.   A trial was there-

upon had resulting in a verdict and judgment for plaintiff in the sum of $5000. Defendant has appealed.

One of the points contended for is that the cause was removable. If so, then the only tribunal with authority and jurisdiction to try the case is the Federal court. For this reason the question of removability should be passed on at the outset, because, if the case is removable, the state court has no power to proceed further save to order the removal.

Owing to the diverse citizenship of the parties, the right of removal would ordinarily exist, but this suit, as above stated, is based on the Federal Employer's Liability Act (Act of Congress approved April 22, 1908, 35 U. S. Statutes at Large 65, chapter 149) as amended by Act of Congress approved April 5, 1910 (36 U. S. Statutes at Large 291, chap. 143). As amended, section 6 of said act provides that "The jurisdiction of the courts of the United States under this act shall be concurrent with that of the courts of the several states, and no case arising under this act and brought in any state court of competent jurisdiction shall be removed to any court of the United States." Defendant is not unmindful of this provision of the act, but the point is made that this provision does not forbid the removal of the case where the requisite diversity of citizenship exists to give such right, or where the right of removal exists by virtue of some other law. It is urged that the above quoted portion of the act was only intended to deprive the litigant of the right to remove his case where the sole ground for removal was the fact that the cause of action arose under the Employer's Liability Act, a Federal Law; and that where the right of removal was not based simply on that fact but was a right enjoyed by the litigant independent of that act, then his independent right of removal was not affected. Such was the construction placed upon the act in Van Brimmer v. Railroad, 190 Fed. 394. But in Teel v. Railroad, 204 Fed. 918, it is

held that the above quoted provision means just what it says, is remedial and should be liberally construed; and prohibits removal even in cases where, by reason of diversity of citizenship, such right of removal would otherwise exist.  See, also, to the same effect Rice v. Boston and Maine Railroad, 203 Fed. 580; Stafford v. Norfolk, etc., R .Co., 202 Fed. 605; Kelly's Admx. v. Railroad, 201 Fed. 591.  If the point has been passed on by the United States Supreme Court, our attention has not been called to it and until a different holding is announced by that court, we shall hold with the cases last cited.  The application for removal was, therefore, properly denied.

The train on which Pankey was employed as head brakeman was an extra freight which started from a point in Kansas and ran east on its way to Marceline, Missouri.  It reached Floyd, in Missouri, sometime between three and four o'clock in the morning where the train stopped to pick up some freight cars standing on the house track.  The main track at this point runs east and west.  The depot is on the north side of the main track, and the house track lies north of and adjoining the depot and its platform.  The house track leaves the main track at a switch 491 feet east of the depot and runs back west in a reverse curve as it approaches the depot.  That is, as the house track leaves the main track it curves out to the north from the main track until it is in a position where, it can and does turn due west, parallel to the main track, and passes close alongside the platform on the north side of the depot.  The platform between the depot and the main line and on the east end of the depot is gravel and is about the same height as the rails.  But on the north side of the depot at a point a few feet west of the east end thereof, the platform is constructed of wood and, on an incline, rises a few feet until it is about level with the bottom of an ordinary box car and continues on this level to the west end of said platform

and thence goes along the west end of said depot for a few feet till it starts again on an incline down to the gravel platform reaching it at the southwest corner of said depot. The level portion of this elevated platform alongside the house track is 23 feet, 5½ inches long; the distance between the point where the incline starts up and the point where it reaches the platform level is 16 feet, 4½ inches. The top of the platform is 3 feet, 6 inches from the top of the rail, and from the edge of the platform to the first rail is 3 feet, 3 inches. The distance between the main track and the house track, on a line drawn from one to the other at a point just east of the depot, is 55.6 feet.

A few of the cars to be picked up were standing on the house track near the west end of the depot, the east end of the easternmost car being alongside the high platform above described and a few feet east of the west end thereof.

When the train on which Pankey was working arrived at Floyd, he had the list of cars to be picked up and knew their location. He had done about a month's work all told on this particular run in which the crew were expected to take a train over the road once a day. As head brakeman it was his duty to do the switching about the different stations. The evidence did not show how many times he had switched cars at this particular station, but ordinarily they switched cars there every day or two and whenever, during the time he worked on this run, any switching was done there, Pankey assisted in doing it. He had been employed by defendant as a head brakeman for about nine months. The various movements he made about the yard that night, up to the moment he was killed show that he knew the location of the switch, the cars, the house track and the general surroundings of the yard.

The train stopped on the main track and, upon orders from the conductor, Pankey cut the engine and

about 20 cars loose from the rest of the train at a point about a car length west of the depot. The rear brakeman was sent back west to flag any train that might otherwise run up on the remaining portion of the train left standing on the track. The conductor went across to the house track to the cars standing there, opened the knuckle of the coupling on the east end of the east car so that it would readily couple, then walked along the side of the standing cars which were to be picked up comparing their numbers with the list he had of those he was directed to pick up and put in his train. While he was doing this, the engine and twenty cars pulled on east down the main line past the switch to the house track and Pankey went with them. Arriving at the switch he threw it so the twenty cars could back in on the house track down to the depot and couple to the cars standing there. Pankey, then standing on the main line and west of the switch, gave the engineer the signal to back up which the latter obeyed, the cars going over the house track in a reverse curve toward the depot. Owing to the curve thus made by the cars on the house track, if Pankey walked alongside the house track down to the depot, the cars to which the engine was attached would hide him from the engineer. And owing to the number of said cars when the end of the backing train reached the depot, the engine was still on the main track east of the switch, so that even when the depot would be reached by the west end of the backing train, a signal from the ground on either side of the house track and adjacent thereto could not be seen by the engineer. Pankey, therefore, walked down the straight main line track, where he could be seen by the engineer, giving the latter at intervals, the "back up" signal which the engineer obeyed. When Pankey got about even with the east end of the depot he gave the engineer a "slow" or "easy" signal, and then left the main track and walked north over to the house track, and in doing so necessarily passed

out of the engineer's line of vision, since the curve of the cars on the house track shut him off from the engineer's view. At the time Pankey gave the "easy signal" the train was backing at the rate of about four miles per hour. The easy signal means that the car to be coupled is nearly reached and the coupling about to be made and for the speed to be reduced still lower so as not to injure anything when contact with the car occurs. The engineer testified that after receiving the easy signal he backed the train "about a car length, possibly car length and a half, about forty or sixty feet" before he reached the car to be coupled and when the car was reached he stopped, waiting for a signal that the coupling had been made and to go ahead. During the time that the train moved, according to the engineer, 40 to 60 feet, Pankey went from the main track over to the house track and walked down it between the rails in front of the backing train and close to it. The conductor by this time was coming east along the south side of the cars to be switched and, when within a few feet of the west end of the elevated freight platform, he saw Pankey walking between the rails on the house track and just ahead of the backing train. At this time Pankey was alongside the freight platform, and the end of the car to be switched and that of the backing car were about 20 feet apart. The conductor called to him to "Get out of there Tom." Thereupon Pankey "started toward the platform, set his lantern on the platform, placed his hands on the platform and tried to raise himself up, did raise himself off of the ground" and tried to vault on to the platform. Before he could do so, however, the end of the backing box car caught him and crushed him between the car and the platform from which injuries he died. The space between the passing car and the platform was somewhere from five to seven inches.

The petition contained five separate charges of negligence which will be discussed in their order. The answer was a general denial coupled with a plea of contributory negligence and assumption of risk.

The first charge is that defendant negligently maintained the platform so near the side track as to endanger employees engaged in the discharge of their duties thereabouts. The platform and track were both in good condition. The platform was of standard construction, that is, it was the same height from the top of the rail and the same distance from the nearest rail as all other freight platforms on the defendant's line of railway and which were built upon the entire Santa Fe system for the last fifteen years. It was constructed at practically the same height and distance from the track as similar freight platforms are constructed on the M. K. & T., the Frisco, the Union Pacific, The Wabash, and Burlington railroads. The platforms on these roads varied perhaps a few inches in height and distance, but all for each particular road were of a standard, that is, uniform construction, and this particular platform was of the same height and distance as all other freight platforms on the Santa Fe.

It was undisputed that no platforms on defendant's railway were sufficiently far away from the track to permit an employee to be between them and a moving car. There was no evidence that any employees were ever required to go, or that ever went, between such platforms and moving cars in the performance of their duties in the handling of trains and cars. On the contrary, the evidence was that they were not required to and did not do so. All of the platforms were built too close to the track to allow a person to be safely between any of them and a passing car. None of them would be safe for anybody to go there. And the evidence was that on none of the railroads is it safe for an operator of a train to go between the train and the platforms. Under this state of facts it is not perceived in

what way defendant was negligent so far as the construction of the platform is concerned. If platforms were ordinarily far enough away to allow employees to go between them and a passing car whereby deceased was led to believe that he could with safety go between the car and this one, but could not safely do so because it was closer than the others, then defendant would be negligent in constructing it closer to the track than the others. And if the duties of the employees required them to be, or to go, between the platform and cars when passing, then the obligation would rest upon defendant to place the platforms far enough away from the track to permit employees to perform such duties in safety. In other words, while it is the master's duty to see that no structures are erected so close to the track as to injure sevants when they are where they may be expected to rightfully be in the discharge of their duties, yet this does not require the master to place the structures so far from the track that a servant cannot be injured thereby even though he place himself where he hs no right to be. As said by 3 Labatt on Master and Servant 2613, speaking of the fact that railway companies have no right to place structures, for any purpose, so near the track that the *slightest indiscretion* on the part of the employee will prove fatal, "the *test* of the company's negligence will be whether the structure or other object which caused the injury was dangerous or unsafe to persons operating its trains, *when they were exercising what was, under the circumstances, ordinary care.*" Consequently, there are many cases holding a railroad company liable for injuries caused by structures erected so closely to the track that they struck operatives who were in the proper performance of their duties. For example, a mail catcher which struck a fireman while at his post and in the line of duty and on the lookout for signals; a bolt in a bridge truss which caught a brakeman's clothing while he was in the line of duty and where he

had a right to be; and many other cases where opera-
tives at their posts of duty were struck and injured. In
all of them, an essential element necessary to recovery
was that the servant at the time of the injury was
where he could reasonably and rightfully be expected
to be in the performance of his duties and in the exer-
cise of ordinary care. [Gould v. C. B. & Q. Ry., 66 Iowa,
590.] The same element is found in the cases of Clay
v. Chicago Milwaukee and St. Paul Ry. Co., 115 N. W.
949; Murphy v. Wabash, 115 Mo. 111; George v. Rail-
road, 225 Mo. 364; Charlton v. Railroad, 200 Mo. 413.
In all of these cases it was held that the employee was
in the line of his duty and acting with ordinary care,
and, therefore, the master should have taken such du-
ties into consideration and guarded against such an ac-
cident as happened. In the Murphy case, 115 Mo. l. c.
119, the court said, "it will not do to say the question
is one for a jury simply because an injury has hap-
pened; for in constructing the fence and in maintaining
it the defendant was not called upon to anticipate or
take into consideration every possible accident," and
after analyzing various cases wherein the question in
each was whether the employee was in the proper per-
formance of his duties, the court on page 124, said:

"The difficult question here is whether the plain-
tiff was in the line of his duty when he took this posi-
tion on the outside of the cab and tender for the pur-
pose of tightening the nut. It is common information
that brakemen climb up or down the ladders often
placed on the outside of cars, and this too, while the
cars are in motion. The evidence as to what engineers
do or are expected to do in this respect is meager, it
must be conceded. The evidence shows that engines
have running boards, but a person on these boards
would be inside of the outer line of the cars, and it
seems the engine cabs are a little narrower than the
coaches. Such evidence does not show that plaintiff
was expected to stand on the outside steps of the ten-

der when in motion. But his evidence is to the further effect that it was no unusual thing for engineers to do just what he did in this instance. The evidence of other engineers is to the effect that they would and do tighten nuts which are within their reach, and this, too, while the train is moving. We think there is evidence from which the jury could find that the plaintiff was within the line of his duty when he placed himself on the outside of the tender. And in our opinion the inference may be fairly drawn from the evidence that this accident was one which a prudent person engaged in a like business would have guarded against in building the fence, and it follows that the question of negligence on the part of the defendant was properly submitted to the jury.''

In Charlton v. Railway, 200 Mo. l. c. 437, the court speaks of the unusual attitude assumed by the plaintiff in the Murphy case, but says it was in the line of his duty under the circumstances, and then calls attention to the fact that in the Charlton case Charlton was in no unusual attitude but strictly where his duties called him. This requirement that the employee must be where he ought reasonably to be expected to go in the performance of his duties is necessary because if the injury arises out of the fact that the employee was in an unusual place, or where it would not be anticipated that he would put himself in the exercise of ordinary care, then the cause of the injury is his own negligence and not that of the master in erecting the structure.. Now, in this case, plaintiff was not hurt while attending to his duties in the place where he was reasonably expected to go, but in a place where he knew he could not go with safety. He had worked for the road nine months. All platforms were too close to permit any one to go between them and the cars. If deceased, while in his proper place and engaged in switching cars, had ben struck by this platform a different question would be presented. But that is not the case here.

He knew the platform was there because he went to it and set his lantern upon it. He did not go there believing he had room enough to stand between the platform and car and was crushed while standing there. He knew he did not have room to stand there, because he was attempting to vault upon the platform out of danger, but, unfortunately, did not do so quick enough. He could have moved out of danger in an instant had he stepped to the north side of the track, but did not do this. He was not required to be on the south side at that time any more than on the north side since he was out of the engineer's view on either side owing to the curved line of the cars. The evidence was that when such is the case and he wants to signal the engineer a proper thing to do is to get upon the car where one can be seen by the engineer. There was nothing for him to do at the place of coupling except to see that the coupling held when the contact was made. This did not require him to get on the track or between the cars. It can be readily seen, therefore, that the case does not come within the line of those cases where a structure has been erected so close to the track as to injure employees stationed where they have a right to be and intent on the performance of their duties and without knowledge of the dangerous proximity of the structure.

In the case of George v. Railroad, 225 Mo. 364, cited by plaintiff the employee was not only where he should have been, but there was a rule requiring all buildings to be at least six feet from the track, and the building in question was only four feet. The employee had a right to assume that this building was also the proper distance therefrom.

In the case of Hemmingsen v. Railroad, 114 N. W. 785, the platform was of irregular shape, some portions of it being much farther away than others, varying from 11 inches to 2 feet or more, and the employee took up his position by the platform not realizing how close the car came to it at that point. That case was

decided by the Supreme Court of Wisconsin in 1908, and if these and other peculiar facts do not distinguish it from other cases, it is, in effect, overruled by the later case of Haring v. Railroad, 119 N. W. 325. In that case the Supreme Court of Wisconsin held, as a matter of law, that the railroad was not negligent in maintaining a platform built as freight platforms usually are as to height and proximity to track where there was, as in the case at bar, a safe place on the other side of the track and the deceased was not ordered or called upon to take the position he assumed. No negligence can, therefore, be predicated on the proximity of the platform.

The next charge of negligence is that the engineer should have stopped when Pankey, in moving from the main line over to the house track, passed out of the line of his vision. There was no rule to that effect shown. Nor was any practice or custom requiring the engineer to stop, when the light disappeared from a known cause, shown to be in existence on the Santa Fe. While it was shown that the same *signals* were in use on all the roads, yet the testimony all showed that each road had its own *rules* governing the management of trains and what to do under a given set of circumstances. The witnesses for plaintiff who testified that the engineer should have stopped when Pankey passed out of the line of the engineer's vision, were not able to state and did not know whether such was the rule and custom in force on the Santa Fe. And all of defendant's evidence was that such was not the rule nor custom when the reason for the light being no longer seen was known and understood. To make a custom effective it must be shown to have been general, uniform, certain and notorious, known to the parties or so general and universal in its character that knowledge must be presumed. [Shields v. Railway, 87 Mo. App. 637; Boyd v. Graham, 5 Mo. App. 403; Sweet v. Leach, 6 Ill. App. 212; C. M. & St. P. Ry. Co. v. Lindeman, 143 Fed. 946.]

There was no custom shown binding on the parties which made the engineer's act in obeying the deceased's "easy" or "slow" signal, given just before he passed out of sight, instead of stopping, a violation thereof. Plaintiff, in effect, concedes this, but says she is not relying upon proof of a custom. Her contention is that the engineer's act in continuing to move after Pankey passed out of view was a failure to exercise ordinary care. Unless there was a rule or custom which required him to stop we cannot see how a failure to stop under the circumstances was a lack of care. Pankey when he disappeared was 40 feet or more away from the track. He was in no possible danger. The engineer had no intimation that deceased would place himself on the track in front of the cars, or that he would get between the ends of the cars which were backing. The engineer had a right to presume that Pankey would not go into danger since he was nowhere near it, and just before he disappeared he gave the "easy signal" which directed the engineer to slow down, as he was about to reach the car to be coupled. Pankey's duties did not require him to get between the cars nor upon the track. The case is not like one where the brakeman is known to be at a place of danger and the light, from some unknown cause, disappears. To proceed under such circumstances would be in reckless disregard of the safety of the brakeman, and would certainly evince a lack of care. But the engineer knew, both from his own knowledge as to where the cars to be coupled were and from the "easy" signal given by Pankey, that he was no great distance from them. And this easy signal meant to go on but at a still slower pace. Pankey gave this order and then passed out of view. He knew he was out of sight because he had theretofore staid on the main track in order to be in view. After giving this order and passing out of sight and knowing the order was being obeyed, he placed himself in front of the train and walked

down the track toward the car to be coupled and only a few feet ahead of the car moving behind him, and continued to do so until the conductor called to him to get out of that situation. Under such circumstances he knew of the danger and deliberately chose to encounter it while the engineer, having no intimation whatever that he was in danger, obeyed the order given him and moved the car down the track the short distance necessary to effect the coupling. Under such circumstances it is not seen where the engineer displayed any lack of care. The cars did not come back at a time when they were unexpected, and contact with the car to be coupled was made in the usual manner.

The remaining charges of negligence were that the cars were backed at a high and reckless rate of speed; that the grounds were obstructed so as to interfere with the giving of signals; and that the grounds were not maintained in such condition that employees might be in a position of safety while giving signals.

As to these, there was no evidence that the cars were backed at a negligent rate of speed. And as to the maintenance of the grounds, while the evidence does show there were some bridge timbers piled on the grounds, yet there is no evidence showing that they were negligently piled or placed there. They did not interfere with the handling of the train and were not the cause of the interference with the giving of the signals since the curved position of the cars on the track did that anyway. In fact, the evidence does not show the accident was brought about in any way through the deceased's inability to give a signal. He had placed himself on the ground directly in front of a moving car where a signal could not have been seen had the track been straight and nothing in the way. He was not attempting to get to a place where he could give a signal. He could not do that from the depot platform; and to have signalled from the ground he would have had to go a considerable distance from the

track on either side. The only place where he could have been readily seen was the top of the car, but by placing himself in front of the end of the car he was in no position to get on top of it. There is, therefore, no evidence of any negligence on the part of the defendant causing deceased's injury. While on the other hand the evidence clearly shows that it was brought about solely by his own negligence in voluntarily and unnecessarily placing himself in a place known to be exceedingly dangerous. And then after being in this dangerous situation, instead of stepping to sure safety on the unobstructed north side of the track, he chose the dangerous expedient of setting his lantern upon the high platform and attempting to vault upon it out of danger. Unfortunately he did not succeed. Under the Employer's Liability Act, if there was negligence on the part of the defendant, contributory negligence of the deceased does not bar a recovery but only diminishes the damages in proportion to the amount of negligence attributable to such employee. Where, however, there is no negligence on the part of the master, but the injury is solely the result of the employee's negligence, there can be no recovery. That such is the case here we think there can be no doubt. Pankey gave the slow signal and then went from a place of safety, and, without notice or intimation to any one, placed himself in an exceedingly dangerous situation. He was not required to do this in the performance of his work. And when the danger of his situation evoked a warning from his conductor, he voluntarily chose a dangerous instead of an easier and a surely safe way out. This last was in itself negligence. [Moore v. Railway, 146 Mo. 572; 1 Bailey on Pers. Inj. relating to Master and Servant, Secs. 1121, 1123; Hurst v. Railway, 163 Mo. 309.] To say that the engineer should not have obeyed Pankey's "easy" signal but should have stopped when Pankey, 40 feet from the track, walked out of view, would require of the engineer almost divine powers of

prescience, for, without them, he could not anticipate that Pankey would walk toward and get upon the track in front of the backing car and go down the track toward a car standing thereon alongside the depot platform, and then attempt to climb out of danger by way of the platform when the cars were less than 20 feet apart. The judgment must, therefore, be reversed. So ordered. The other judges concur.