(No. 33264.—

JAMES P. HALL, Appellant, *vs.* CHICAGO AND NORTH WESTERN RAILWAY COMPANY, Appellee.

*Opinion filed January 21, 1955—Rehearing denied March 22, 1955.*

JAMES A. DOOLEY, of Chicago, for appellant.

LOWELL HASTINGS, DRENNAN J. SLATER, and EDWARD WARDEN, all of Chicago, for appellee.

Mr. JUSTICE HERSHEY delivered the opinion of the court:

The plaintiff, James P. Hall, brought suit under the Federal Employers' Liability Act (45 U.S.C.A. 51-60) to recover damages for personal injuries sustained on August 11, 1947, while he was employed as switchman by the defendant, Chicago and Northwestern Railway Company,

a common carrier engaged in interstate commerce. On May 7, 1952, the jury returned a verdict for the plaintiff in the amount of $50,000, and the court entered judgment thereon. The defendant filed a motion for judgment notwithstanding the verdict, and the plaintiff moved for a new trial. The court denied the defendant's motion, but allowed the plaintiff's motion for a new trial.

The defendant appealed from said order granting a new trial to the Appellate Court pursuant to section 77 of the Civil Practice Act. (Ill. Rev. Stat. 1953, chap. 110, par. 201.) The Appellate Court reversed the trial court and remanded the case with directions to reinstate or restore the judgment. (349 Ill. App. 175.) The plaintiff filed a petition for leave to appeal to this court, to which the defendant made a motion to dismiss. We allowed the defendant's motion to dismiss.

Accordingly, the cause was redocketed in the trial court, and judgment was entered on the verdict for the plaintiff. Both parties filed notices of appeal to the Appellate Court. On this second appeal, the Appellate Court reversed the trial court's denial of defendant's motion for judgment notwithstanding the verdict and remanded the cause with directions to enter judgment for the defendant. (1 Ill. App. 2d 552.) The plaintiff petitioned this court for leave to appeal, which we granted.

The injury complained of occurred on August 11, 1947, on the premises of the Nachman Company in Chicago. The plaintiff was a member of a five-man switching crew which was picking up four empty freight cars from the Nachman plant.

In this vicinity the defendant's main track runs in a general northerly and southerly direction, and the Nachman Company premises, enclosed by an iron fence, are located along the east side of the track. An industry track leading into and servicing the Nachman Company curves off to the southeast from the main track, or to the left as

one faces south on the main track. This industry track crosses the gate leading into the premises at a diagonal, the gate post on the east side (or to the left as one enters the premises) being 10 feet 8 inches farther north than the gate post on the west side. Just inside the gate and on the east side of the track (to the left) is located a freight platform, which is used for loading and unloading merchandise. On the west end of this platform (facing one entering the gate) is a sign, all in caps, reading "WARNING NO CLEARANCE FOR MAN ON SIDE OF CAR." There is no sign of any character on the east end.

The crew consisted of an engineer, a fireman, two switchmen and a conductor. The plaintiff, a switchman, was acting as "field man," and as such it was his duty to make couplings or uncouplings whenever necessary. They had two loaded freight cars for delivery to Nachman, but before making the delivery it was necessary to pick up four empty cars which were located on the industry track a few hundred feet inside the premises.

The two loaded cars were uncoupled and left standing outside the gate on the main track just south of the point where the industry track joins the main track. After the plaintiff uncoupled these two cars, he and the conductor entered the premises through the gate. It was the first time the plaintiff had been on the Nachman Company premises. He said he saw the freight platform at his left when he entered and also noted that the track was curved. However, he said he "did not believe [he] looked for a sign." He and the conductor thus continued walking for a distance of a few hundred feet, the conductor, who was in charge of the crew, explaining the switching operation to the plaintiff.

The engine, tender and caboose then backed in and coupled onto the four empty cars. The engine, then facing in a general northwesterly direction, pulled ahead, with the tender, caboose and four cars following in that order.

The plaintiff took a position at the bottom step on the east side and south end of the caboose (*i.e.*, on the right side of the caboose as one faced the gate). The conductor rode at the rear of the cut of cars. It was the plaintiff's job to ride the cars out and to transmit any signals from the conductor to the engineer, who was also on the right side.

The plaintiff said it was his intention to ride beyond the platform and the gate, to get off the caboose outside the gate, and then go to the two loaded cars and make the coupling. However, instead of looking at the freight platform or at the gate post on the east side (*i.e.*, on the side he was riding,) he was looking across the platform of the caboose, and when he saw the gate post on the west side he got off with his back to the freight platform. He was pressed between the platform and the freight car following, sustaining severe personal injuries.

The following additional, undisputed evidence was adduced at the trial: The speed of the train was about four miles per hour. It was stopped as soon as plaintiff was injured. While he was riding on the step of the caboose he was in a position of complete safety and could have passed the platform without any difficulty. His work did not require him to get off opposite the platform, and he did not intend to get off there. At no time while he was thus riding the caboose did he look in the direction of the platform, although it was a clear day and there was no obstruction to his view had he looked. The plaintiff was an experienced switchman with some twenty-four years of railroad experience and was cognizant of a company rule which required him to familiarize himself with close clearances, but he testified that he had never come into an industry where there was a slanting gate other than this one leading to the Nachman Company premises. He had worked in other places where there were close clearances, and it appeared he knew of this close clearance, for while riding on the caboose he told another member of the

switching crew, Thompson, who was new on the job, to "ride high" on the cars because the "platforms were not clear."

It further appeared that the freight car which struck the plaintiff was fifty feet in length, and such fifty-foot cars had been in use for eight or ten years. At the time the platform was constructed, thirty-five years before, thirty-five or forty-foot cars were in common use. Fifty-foot cars are wider than thirty-five or forty-foot cars, and there was testimony that placed the distance between a fifty-foot car and the platform at from three to six inches, although it was stated that all fifty-foot cars are not of the same width. There was evidence that employees of the defendant had complained about this platform. Also, there was some evidence that the platform could be cut off and still used for unloading purposes, the defendant's chief of yards testifying as follows: "Oh, it could be cut off but wouldn't be fit for unloading purposes without large runways and so forth."

Two questions are now before this court: (1) Was the Appellate Court in error in reversing the order of the trial court which denied defendant's motion for judgment notwithstanding the verdict? (2) Was the Appellate Court in error in reversing the trial court's order which granted the plaintiff a new trial?

We shall first consider whether the Appellate Court was in error in reversing the trial court's denial of defendant's motion for judgment notwithstanding the verdict.

This court in the recent case of *Bonnier* v. *Chicago, Burlington and Quincy Railroad Co.* 2 Ill. 2d 606, stated at pages 607-8 the general rules relative to considering a motion for judgment notwithstanding the verdict in a case of this nature: "The well-established rule in both the Federal courts and the courts of Illinois is that a motion for judgment notwithstanding the verdict presents *only a question of law* as to whether, when all the evidence is consid-

ered, together with all reasonable inferences therefrom in its aspect most favorable to the plaintiff, there is a total failure or lack of evidence to prove any necessary element of plaintiff's case. (*Wilkerson* v. *McCarthy*, 336 U.S. 53, 93 L. ed. 497; *Lindroth* v. *Walgreen Co.* 407 Ill. 121; Ill. Rev. Stat. 1951, chap. 110, par. 259.22.) Section 1 of the Federal Employers' Liability Act makes a carrier liable in damages for any injury or death 'resulting in whole or in part from negligence' of any of its 'officers, agents, or employees.' Other provisions of the act abolish the defense of assumption of risk and provide that contributory negligence of a plaintiff shall not bar a recovery. (45 U.S.C. 51, 53 and 54.) Thus, the sole question presented on appellate review is whether there is any evidence, considered in the light most favorable to the plaintiff, that defendant was guilty of negligence which contributed in whole or in part to plaintiff's injury."

The principal charge of negligence urged by the plaintiff is that the defendant failed to provide him with a reasonably safe place within which to work. In this connection counsel for the plaintiff argues that there was the "unalloyed deceptiveness of the situation," allegedly resulting from the fact that the track curved sharply as it entered the Nachman premises, the track crossed the gate at a diagonal, so that the gate post on the east side (to the left as one entered the premises) was 10 feet 8 inches farther north than the gate post on the west side, other employees had complained about the situation, and this was the plaintiff's first day on the premises. These facts, it is contended, spell "Trap."

While it is true, as the Appellate Court points out, that a close clearance with accompanying danger is not in itself sufficient to warrant a finding of negligence; (*Atlantic Coast Line R. Co.* v. *Powe*, 283 U.S. 401; *Davis* v. *Hand*, 290 Fed. 73; *Toledo, St. Louis and Western Railroad Co.* v. *Allen*, 276 U.S. 165; *Mobile and Ohio Railroad Co.* v.

*Vallowe,* 214 Ill. 124;) still, the close clearance coupled with an additional element of deception may be sufficient to justify an inference of negligence. See *Ellis* v. *Union Pacific Railroad Co.* 329 U.S. 649.

In the *Ellis case* the plaintiff was crushed between a moving railroad car and a building, while acting as engine foreman in charge of a switching crew. The crew was engaged in backing an engine and boxcar around a curve on a spur track where visibility was obstructed by the building located on the inside and near the middle of the curve. The plaintiff was standing on the ground on the same side as the building and to the right of the engine, and was controlling operations by hand signals to the engineer. A switchman was located around the curve, out of sight of the engineer, on a loading platform at which the car was to be spotted. As the car moved past the plaintiff it caught and pinned the upper part of his body against the wall of the building. The court concluded that the situation was deceptive because the overhang of the car on the curve and its tilt, toward the building resulting from a higher outside rail reduced clearance materially, and the place where the plaintiff was standing was in the one short segment of the arc of the curve where clearance was insufficient. There was a sign near the building and some eight feet above the ground reading "IMPAIRED CLEARANCE." In holding that there was sufficient evidence upon which to base a jury verdict for the plaintiff the court said at page 652: "* * * it would not have been unreasonable for the triers of fact to have inferred that it was proper and usual procedure to work on the right side of the engine, that the hazard was not readily apparent and was almost in the nature of a trap, that while the sign was placed so as to be readily visible from a train, it was insufficient warning to a man on the ground, and that consequently the petitioner was not furnished with a safe place to work."

In the instant case, also, there is an element of deception coupled with the close clearance. For, as aforesaid, the gate post on the east side was 10 feet 8 inches farther north than the gate post on the west side. As a result thereof, a car leaving the premises can be outside the gate on the west side but still inside the premises on the east. It was this condition which appeared to have confused the plaintiff, for when he saw the car was outside the post on the west side, he mistakenly assumed it was also outside the gate on the side near the platform. Albeit he was mistaken, and also that he was negligent in not being more careful, still, we cannot say as a matter of law that a jury could not find that the maintenance of this freight platform in such proximity to the track and the gate was not negligence and that such did not contribute, even in part, to the plaintiff's injury. It must also be borne in mind that this was the first time the plaintiff was on the Nachman Company premises, he had never seen a slanting gate such as this leading into an industry premises, and employees of the defendant had previously complained about the condition. It is to be noted further that the hazard created when the platform was constructed thirty-five years previous, at which time thirty-five and forty-foot cars were used, was increased by the introduction and use of the fifty-foot car. Despite the utilization of the wider car, which was said to come to within three to six inches of the platform, nothing was done relative to the location of the platform. Moreover, there was some evidence that the platform could have been shortened and still be useful for unloading purposes, and the failure to adopt changes in the structure to lessen the danger caused by the use of the wider car is indicative of a lack of due care on the defendant's part.

Contributory negligence is, of course, no defense under the Federal Employers' Liability Act, and if there is any evidence in the record from which the jury could have

concluded that the defendant's negligence contributed, at least in part, to the plaintiff's injury, the court is not justified in granting a motion for judgment notwithstanding the verdict. The Supreme Court of the United States stated in the *Ellis case* on page 653: "Once there is a reasonable basis in the record for concluding that there was negligence which caused the injury, it is irrelevant that fair-minded men might reach a different conclusion. For then it would be an invasion of the jury's function for an appellate court to draw contrary inferences or to conclude that a different conclusion would be more reasonable."

There seems to be a sparsity of authorities pertaining to close clearances created by freight platforms, there being only one case cited, *Pankey* v. *Atchison, Topeka and Santa Fe Railway Co.* 180 Mo. App. 185, 168 S.W. 274, involving a freight loading platform. This case contains language which supports the defendant's position, but the facts are distinguishable from the case at bar. In the *Pankey case* the decedent, a brakeman, was crushed between a car and the freight platform of a depot. Judgment for the plaintiff was reversed on appeal. The platform in question was located along the south side of a house track, which ran in a general easterly and westerly direction. There were cars spotted just west of the platform on this track, which the train, approaching from the east, was to pick up. As the train was backing toward these cars, the decedent was signalling the engineer, the decedent then standing on the main track, which ran parallel with the house track on a line some fifty-five feet south. When the train came to within 40 to 60 feet of the car to be coupled, the decedent gave the engineer the "easy signal." The decedent then walked from the main track to the house track, and walked west on this track in front of the train and close to it. When he was alongside the platform, and the end of the car to be coupled and that of the backing car were about twenty feet apart, another employee yelled for the decedent

to get out of the way. Whereupon, the latter started toward the platform and tried to climb upon it. But before he could do so, the end of the backing boxcar caught him and crushed him between the car and the platform. The distance between the edge of the platform and the first rail was three feet six inches, and the clearance between the car and the platform was from five to seven inches.

It can be seen that in the *Pankey case* there was a close clearance, but there was nothing to make the condition deceptive. Unlike the situation in the instant case, there was nothing about the platform or surrounding environs which would in any way indicate that the plaintiff's decedent could safely be where he was when the injury occurred. In the case at bar, the fact that the gate was so constructed as to be somewhat misleading and deceiving as to when the car upon which the plaintiff was riding was safely outside the premises distinguishes the facts here from those of the *Pankey case*.

Considering all the evidence in this record, in the light most favorable to the plaintiff, we conclude that there was sufficient evidence to show that the defendant did not furnish the plaintiff with a reasonably safe place to work, which failure contributed at least in part to the plaintiff's injury. Since we have so concluded, it is not necessary to consider other grounds of alleged negligence urged by the plaintiff.

Since we have concluded that the defendant was not entitled to judgment notwithstanding the verdict, we must next consider whether the Appellate Court, in its prior opinion, was correct in holding that the trial court erroneously granted the plaintiff a new trial.

Before considering the merits of this question, however, it is necessary to determine if such issue is properly before us on this appeal. Both parties agree that it is, but it appears we have not previously passed on this precise point.

It will be noted that on the first appeal of this case to the Appellate Court, the only issue passed upon was the trial court's decision to grant the plaintiff a new trial. The plaintiff filed a petition for leave to appeal to this court, and we allowed the defendant's motion to dismiss his petition. The particular question now before us is whether, after the case has been remanded to the trial court and judgment entered thereon pursuant to the first Appellate Court opinion, a second appeal is perfected to the Appellate Court at which the latter considers only whether there was sufficient evidence to warrant judgment notwithstanding the verdict, and we allow a petition for leave to appeal from the second decision, the question passed upon by the Appellate Court in its first opinion is now before us for decision.

That the new trial issue may properly be reviewed by us on this appeal seems to be implied in *Kavanaugh* v. *Washburn,* 387 Ill. 204. In that case the jury found for the defendant, and the trial court granted the plaintiff a new trial. The defendant filed a petition under section 77 of the Civil Practice Act for leave to appeal to the Appellate Court. The right to appeal was granted, and the Appellate Court held that the trial court was wrong in granting a new trial. The trial court was reversed, and the cause was remanded with directions to enter judgment on the verdict. The plaintiff then filed a petition for leave to appeal to this court, to which the defendant filed a motion to dismiss. The motion to dismiss was allowed.

We said in the *Kavanaugh case,* at page 210: "When the cause is redocketed on an order of reversal and remandment, it should leave the parties in the same position as they were before the trial court ordered a new trial." Further, on page 212, we stated: "Defendant suggests that when the trial court enters judgment pursuant to the mandate of the Appellate Court, plaintiff then has a right to appeal to the Appellate Court and follow the regular pro-

cedure as is permitted on final judgments by petitioning for leave to appeal to this court. Plaintiff answers by asserting that when the cause reaches the Appellate Court the second time, it would be subject to dismissal for the reason that the only question then open would be as to whether the trial court had followed the mandate of the Appellate Court. In appeals from final judgments, that rule has its application but the difference between the character of such judgment and the one the Appellate Court is authorized to enter in a case where it is reviewing an order granting a new trial must be kept in mind. It is possible that the questions submitted on the second appeal would be the same as those presented in the review of the order granting the new trial, but such similarity of questions would not permit a dismissal of the second appeal on the grounds stated by plaintiff. We conclude that the regular course of procedure for appeals from final judgments is open in this kind of case after the judgment on the verdict has been rendered."

Thus, it is stated that the "regular course of procedure for appeals" is open in cases of this character as soon as a final judgment is obtained, although there has been an opinion written by virtue of leave to appeal granted under section 77. Part of the final judgment is the action on the motion for a new trial, and this court can review the Appellate Court's decision thereon.

An analogous situation arises under section 78 of the Civil Practice Act, which authorizes appeals from interlocutory orders concerning injunctions and receivers. It is expressly stated in said section that "No appeal shall be taken from the order entered by said Appellate Court on any such appeal," and no provision is made relative to a review by this court following final judgment entered after remandment from the Appellate Court. We held, however, in *Firebaugh* v. *McGovern,* 404 Ill. 143, that the decision of the Appellate Court on the interlocutory order (in that

case, the appointment of a receiver) was open for review in this court after an appeal from the final judgment in the case on the merits. We said at page 147 thereof: "The statute does no more than grant an immediate right to review the order itself; it does not change the interlocutory character of the order. The judgment of an Appellate Court reviewing such an order may therefore itself be reviewed as a part of the case after there has been a final adjudication."

There are other cases of this court which hold to the principle that a decision of the Appellate Court on a first appeal, which decision is not reviewable by us under section 75 of the Civil Practice Act, or otherwise, is not binding upon us in reviewing the Appellate Court's decision on a second appeal. See: *Frank* v. *Salomon,* 376 Ill. 439, 441-2; *Board of Trade* v. *Nelson,* 162 Ill. 431, 437; *McLaughlin* v. *Hahn,* 333 Ill. 83, 87; *Freet* v. *American Electrical Supply Co.* 257 Ill. 248, 257; *Stripe* v. *Yager,* 348 Ill. 362, 365; *Streeter* v. *Humrichouse,* 357 Ill. 234, 238.

We now consider the merits of the question, which involves the determination of whether the Appellate Court, whose opinion is reported in 349 Ill. App. 175, was correct in reversing the order of the trial court granting the plaintiff a new trial.

The plaintiff sought and obtained the order for a new trial on the ground that substantial prejudice resulted to him by reason of remarks made by counsel for the defendant in his closing argument to the jury. The main objection of the plaintiff was to that portion of the argument wherein counsel said that whatever amount the plaintiff receives by way of a verdict is not subject to Federal income tax. Said remarks were as follows:

"Mr. Warden [counsel for defendant] : * * * I say again if you believe that the opposition here has proved by a preponderance of evidence that the defendant is guilty of negligence which caused these injuries, then you are

going to have to award him a verdict, and whatever amount he receives by way of a verdict in this case is not subject to Federal income tax.

"Mr. Dooley [counsel for plaintiff] : I object to that.

"The Court: They are so instructed.

"Mr. Warden: That is the law, your Honor.

"The Court: That may be stricken.

"Mr. Dooley: Let the jury be instructed to disregard it.

"The Court: They are so instructed.

"Mr. Warden: Well, under the Court's ruling, ladies and gentlemen, simply disregard what I have said to you about taxes."

The trial court was of the opinion that the foregoing remarks of defendant's counsel resulted in such prejudice to the plaintiff as to justify granting him a new trial. The Appellate Court, concluding that the remarks were proper, reversed the trial court and remanded the case with directions to reinstate or restore the judgment.

This is a case of first impression in this court, and so far as we have been able to ascertain, with the exception of the Appellate Court decision, only one reviewing court in this country has sanctioned an instruction, or argument, which points out that a personal injury award is not subject to Federal income tax.

In considering this question it must be borne in mind that the trial judge during the course of the trial ruled that on the issue of earning capacity evidence of gross earnings before taxes was proper. This ruling appears to be in accord with the weight of authority. See, for example, 9 A.L.R. 2d 320, where the annotator states, at page 321 : "Where the question has arisen, in reported cases, the courts generally have been of the opinion that in fixing damages for impairment of earning capacity the fact that the damage award will be exempt from income tax, whereas if the awardee had not sustained the loss of earning capacity and had gone to work and received the

income forming the basis of such damage award, he would have become subject to income tax liability on such earnings, is not a matter to be taken into consideration and is no ground for diminishing the amount of damages for impairment of earning capacity." To the same effect is a case involving this same defendant, *Chicago and Northwestern Railway Company* v. *Curl,* 178 Fed. 2d 497, where the court said at page 502: "Appellant's assignment of error in the court's refusal to receive evidence offered by appellant raises the question whether the present value of appellee's probable future earnings was to be computed upon his average gross income as a railroad fireman, or upon his average income in that capacity after deductions for income tax, railroad retirement, and other miscellaneous deductions. The actuary who testified for appellee based his computations on appellee's gross income for several years prior to the action, and the court refused to receive appellant's offer of proof of appellee's average net earnings after deductions. Appellant offers no authority in support of this contention. But see and compare *Stokes* v. *United States,* 2 Cir., 144 Fed. 2d 82, 87; *Cole* v. *Chicago, St. P., M. & O. Ry Co.* D.C., 59 Fed. Supp. 443, 445; *Majestic* v. *Louisville and Nashville Railway Co.* 6 Cir., 147 Fed. 2d 621, 626-627. We conclude that there was no prejudicial error in the court's refusal to accept appellant's offer of proof."

Further, the jury was correctly instructed on the measure of damages, being told specifically the elements that they should consider in awarding damages. Hence, unless it be assumed that they might not follow the instructions, there could be no purpose in mentioning anything about the award not being subject to Federal income tax. However, by the very nature of the jury system this court cannot indulge the presumption that juries do not follow the instructions of the courts. The Supreme Court of the United States, in *Wilkerson* v. *McCarthy,* 336 U.S. 53,

said, at page 62: "Courts should not assume that in determining those questions of negligence, juries will fall short of a fair performance of their constitutional function. In rejecting a contention that juries could be expected to determine certain disputed questions on whim, this Court, speaking through Mr. Justice Holmes, said: 'But it must be assumed that the constitutional tribunal does its duty and finds facts only because they are proved.' *Aikens* v. *Wisconsin,* 195 U.S. 194, 206." It may be conceded that the possibility of harm exists if the jury is left uninformed on this matter; on the other hand, it is conceivable that the plaintiff could be prejudiced if they were told of this law. In either case, however, the possibility is speculative and conjectural, and such being the case, it is better to instruct the jury on the proper measure of damage and then rely on the presumption that they will properly fulfill their duty by following said instructions.

It does not necessarily follow that the argument is proper because it correctly states the law. For if the defendant's argument is proper on the basis that it tells the jury what the law is then what objection can there be for plaintiff's counsel to state that the expense of trial is not provided for in the instruction concerning damages, that the cost of medical witnesses is not paid by the defendant, that the expense of taking depositions, as well as court reporting at the trial, must be borne by the individual litigants, that the fees of plaintiff's attorney are not recognized as an element, that the defendant can deduct any award it pays from its income and excess profits tax return and that the amounts of awards are allowed as expenses in providing for increasing railroad fares? This could be developed *ad infinitum,* and all this is the law.

It is a general principle of law that in the trial of a lawsuit the status of the parties is immaterial. Thus, what the plaintiff does with an award, or how the defendant acquires the money with which to pay the award, is of

no concern to the court or jury. Similarily, whether the plaintiff has to pay a tax on the award is a matter that concerns only the plaintiff and the government. The tortfeasor has no interest in such question. And if the jury were to mitigate the damages of the plaintiff by reason of the income tax exemption accorded him, then the very Congressional intent of the income tax law to give. an injured party a tax benefit would be nullified.

The defendant has cited *Dempsey* v. *Thompson,* 363 Mo. 339, 251 S.W. 2d 42, wherein the Missouri Supreme Court held that it was proper to instruct the jury that an award was not subject to Federal income tax. For the reasons stated herein, we disagree with the conclusion reached by that court. The decision of the same court two years previously, in *Hilton* v. *Thompson,* 360 Mo. 177, 227 S.W. 2d 675, seems to be more in accord with what the law should be. There that court said, at page 191, as follows: "Appellant complains of error in the refusal of an instruction directing the jury to include nothing in the verdict for Federal, State or City taxes since such taxes could not be assessed upon the amount of any verdict awarded respondent. Appellant cites no authority to support the giving of such instruction. The instruction was properly refused. The jury was properly instructed on the factors to be considered in fixing the amount of respondent's damages and it would not have been proper to inject into the case an extraneous issue regarding the tax exempt status of the damages which might be awarded."

We are of the opinion that the incident of taxation is not a proper factor for a jury's consideration, imparted either by oral argument or written instruction. It introduces an extraneous subject, giving rise to conjecture and speculation.

We cannot, of course, state with certainty that the jury in this case did or did not employ income tax in its calculations. But so long as that possibility did exist, we can

not say that the trial court abused its discretion in granting a new trial. Having so decided, it is not necessary to consider the other examples of prejudicial argument complained of by the plaintiff.

We, therefore, reverse the order of the Appellate Court which reversed the trial court in overruling the motion for judgment notwithstanding the verdict, and we reverse the order of the Appellate Court which reversed the order of the trial court granting the plaintiff a new trial. The cause is remanded to the superior court of Cook County with directions to grant the plaintiff a new trial.

*Reversed and remanded, with directions.*