**LOUISVILLE & NASHVILLE RAILROAD COMPANY, Appellant,**

v.

**Spencer MATTINGLY, Appellee.**

Court of Appeals of Kentucky.

Dec. 12, 1958.

Woodward, Hobson & Fulton, John A. Fulton, John P. Sandidge, Louisville, for appellant.

Vincent J. Hargadon, Harry L. Hargadon, Arnold J. Lemaire, J. L. Bennett, Jr., Louisville, for appellee.

STEWART, Judge.

In this action plaintiff, Spencer Mattingly, sued defendant, Louisville & Nashville Railroad Company (herein referred to as "L. & N."), to recover damages growing out of an injury received by him because of the alleged negligence of L. & N.'s employees in conducting a switching movement. The case was tried before a jury and a verdict of $20,000 was returned in favor of Mattingly.

L. & N. has appealed from the judgment entered, advancing eight grounds for reversal. We have determined that one of the contentions urged for setting aside the judgment must be sustained, namely, that the damages awarded are excessive. Practically all of the other questions raised on this appeal need not be considered because when this case is remanded for a new trial they will not reappear. A preliminary proposition that must be disposed of concerns an instruction which L. & N. claims was erroneously given and two instructions which it claims were wrongfully refused when offered by it. Thereafter we shall discuss the ground we have concluded merits a reversal of the judgment.

These are the facts out of which this litigation arose. On September 14, 1953, Mattingly, then 41 years of age, was engaged in unloading coal on the north end of L. & N.'s switch track at Loretto from a "hopper" type of car with drop-bottom doors. The coal was unloaded by opening the doors and releasing it into a pit from which it was extracted by means of a gasoline-operated conveyor. It was dumped into a truck and then hauled away. In addition to the coal car Mattingly was unloading, a car filled with sand, a gondola loaded with ties, and a boxcar were located on the switch track to the south in the order mentioned.

The switch track is laid out in a general north-south direction, and the grade of the northern portion is lower than that of the southern. Prior to Mattingly's accident, the sand car had been moved with a pinchbar to place it beyond certain cattle pens so it could be gotten to more conveniently with trucks. There is a conflict in the evidence as to whether or not the brakes on it were subsequently reset. Also the position of the coal car was later changed. When this car was spotted only one-half of it could be discharged into the pit because only the north part of it was over the pit. After the coal car was re-spotted its brakes were not reset, but wood chocks consisting of 2″ x 4″ or 2″ x 6″ timbers were placed under some of the wheels. It was admitted this was sufficient to keep the car from rolling so far as the grade was concerned. The distance these two cars were from each other after the movements mentioned was variously estimated at five and one-half to 20 feet.

Sometime during the morning, the owner of the sand informed the local L. & N. agent he desired the car located at another spot on the switch track in order to facilitate its unloading. This message was relayed to the crew of a freight train which was at the time on its way to Loretto. Around noon this train stopped to carry out this order and entered the switch track from the south end after approaching from that direction. Two brakemen went along with the uncoupled engine and walked up to the boxcar and the gondola loaded with ties. These two cars were approximately 200 to 300 feet from the cars loaded with sand and coal.

It was intended a coupling would be made by the engine with the boxcar and the gon-

dola without any difficulty. When this was attempted the coupling missed and the engine's impact was sufficient to start the boxcar and the gondola, which had joined together in the meantime, in motion toward the north for the reason, it will be recalled, the grade was lower in that direction. One of the brakemen soon overtook and climbed the rolling boxcar and started applying its brakes. He was not able to halt the progress of the two cars with the result that they bumped into the sand car and these three continued on and in turn struck the coal car. The latter rolled farther on about three car lengths before stopping.

Mattingly testified that at the time the moving cars struck the coal car he was under it working with an iron bar to dislodge some large lumps which had jammed the passage of coal from the car into the pit. According to his testimony, one of the drop-doors hit him on the head and caused him to double back, and that after a lapse of ten or fifteen minutes from the time of the accident he experienced a sharp pain in his back. It is undisputed in the evidence that shortly after the occurrence of the mishap the conductor and a brakeman of the train contacted Mattingly and the latter refused to give them his name and remarked that he was not hurt.

Mattingly stated that he was under the coal car for approximately eight minutes immediately before he was allegedly injured. On the other hand, one of the brakemen on the train testified that at the beginning of the switching movement there was no one around the coal car but that, after the engine later endeavored to couple the boxcar and the gondola at the south end of the switch track and these cars began to roll, he saw Mattingly walk toward the coal car and bend under it. When the cars hit the coal car, according to him, Mattingly jumped back. This witness emphasized that Mattingly did not at any time crawl under the car but was crouched beside it when it was struck. The engine involved was a steam engine, and the evidence shows that during the entire switch-

ing period its bell was ringing. In addition the conveyor was running when the accident happened.

We shall now pass on the instruction that is claimed to have been erroneous, which was among those given at the conclusion of the evidence after L. & N.'s motion for a directed verdict had been overruled. It is insisted the trial judge wrongfully told the jury to find for Mattingly unless they believed he failed to exercise ordinary care for his own safety. L. & N.'s argument on this point is that Mattingly was contributorily negligent as a matter of law in releasing the brakes on the coal car, moving it to a new position and then not resetting the brakes, and afterwards getting under it with the knowledge that it was downgrade from the nearby sand car which was liable to roll against it unless something stopped it.

The theory advanced by L. & N. is an untenable one for the reason that its trainmen, before moving or disturbing the coal car under or about which Mattingly was working, were under a duty to notify him concerning the switching operation. The local station agent actually knew Mattingly was working in and about the coal car on the occasion and he should have communicated this fact to the trainmen. Furthermore, the true situation could have been easily ascertained by the trainmen themselves had they used ordinary prudence to investigate. It was conclusively shown that Mattingly was ignorant of the presence of the engine on the switch track at the time of his injury. In our opinion the abortive effort upon the part of L. & N.'s brakemen to couple the engine to the boxcar and gondola, thereby setting them in motion so that they struck the coal car, was the proximate cause of the accident which produced Mattingly's injury. Since reasonable minds might differ on the point, we believe the lower court correctly allowed the jury to determine whether Mattingly exercised due care when he placed himself under the coal car after moving it without resetting the brakes. Therefore, it

is our view the lower court was correct in giving the above instruction finding L. & N. negligent as a matter of law under the condition mentioned, and we conclude the evidence amply supports the jury's finding that Mattingly, as regards what befell him, was not guilty of contributory negligence. See Payne v. Raymond's Administrator, 198 Ky. 74, 248 S.W. 224; Chesapeake & Ohio R. Co. v. Plummer, 143 Ky. 97, 136 S.W. 159.

■ L. & N.'s next contention is that the question of whether or not the accident was unavoidable should have been submitted to the jury for determination. In this connection it is maintained L. & N. could reasonably anticipate the engine would couple up the with the boxcar and the gondola on its first attempt to do so and, furthermore, no one would ordinarily expect these cars to roll on and produce the character of accident that resulted. Stated differently, L. & N. claims the ultimate consequence of its initial act could not have been reasonably foreseen and, therefore, liability should not attach to it because of what ensued. An unavoidable accident has been defined as an event or mishap which human prudence and sagacity could not prevent. See Bennett v. Howard, 175 Ky. 797, 195 S.W. 117, L.R.A. 1917E, 1075. It is clear to us that L. & N.'s employees did not employ "human prudence and sagacity" under the circumstances when they failed to place Mattingly upon notice of his peril before the switching operation was undertaken. Undoubtedly Mattingly's injury could have been avoided if L. & N.'s agents had performed the all-too-well-known duty of warning him of the engine's approach in his direction.

■ A novel assertion put forth is that an instruction should have been given to the effect that any award made to Mattingly by the jury would not be subject to income taxes, state or federal. So far as we know, only the state of Missouri has allowed the jury to be advised of this fact by an instruction. See Dempsey v. Thompson, 363 Mo. 339, 251 S.W.2d 42. We are of the opinion Kentucky should follow the majority rule which brands such an instruction as misleading in its effect on the minds of the jury Other jurisdictions which have refused to permit the jury to consider such an instruction, where it was urged to be submitted, have set forth a great many reasons why such an instruction has no place in a personal injury case. Having concluded it will serve no good purpose to write at length on this issue, we refer those who are interested in a discussion of the demerits of this type of instruction to these decisions: Maus v. New York, Chicago & St. Louis Railway Company, Ohio App., 128 N.E.2d 166; Hall v. Chicago & Northwestern Railway Company, 5 Ill.2d 135, 125 N.E.2d 77, 50 A.L.R.2d 661.

The question of whether the damages awarded Mattingly are excessive requires an evaluation of the evidence introduced as to the extent of his incapacity directly attributable to the injury he received. On this subject the medical evidence in this case has an important bearing. Three medical experts testified: Doctor B. J. Baute, a general surgeon who first treated Mattingly and gave a deposition in his behalf, Doctor K. Armand Fisher, a physician and orthopedic surgeon who testified as a witness for Mattingly, and Doctor Luther Fuller, an orthopedic specialist who was called to testify by L. & N. Each of these doctors made numerous X-ray films of Mattingly's spinal column, beginning three days after Mattingly's injury and ending July 21, 1955. Their collective findings established that Mattingly suffered a "compression fracture of the superior surface of the third lumbar vertebra" as a result of the accident, and that ordinarily such an injury would completely heal with no adverse aftereffect when adequately treated. All of them stated from their reading of the X-ray films that Mattingly's eleventh and twelfth thoracic vertebrae had sustained fractures similar in charac-

ter, but pre-existing as to time of causation, to that inflicted on the third lumbar vertebra by the accident. All of them testified to an arthritic condition that involved other regions of the backbone, besides the third lumbar vertebra, that could have and probably did have a disabling effect on Mattingly.

Doctor Baute's opinion was that Mattingly was limited in the use of his spine to 30% of forward flexing, 20% of backward extending, and 15% of lateral bending in each direction. He said, "I presume this is all a result of his injury." This statement plainly ignored the effect of the other prior impairments to Mattingly's spinal column which this physician testified existed. Doctor Fisher, upon cross-examination while testifying from an X-ray he made on July 27, 1955, admitted that Mattingly's third lumbar vertebra was completely healed. Doctor Fuller, in considering X-rays he himself took of Mattingly as well as those previously made by Doctors Baute and Fisher, testified Mattingly had received an injury from the mishap under discussion solely to his lumbar vertebra, which had been restored to a healthy state, and that his present trouble was in consequence of the condition affecting his two thoracic vertebrae, which grew out of an injury that antedated his accident. He stated that the two thoracic vertebrae were still compressed and were much affected with arthritis.

It was brought out that Mattingly had a "bad back"; in fact, his disability in this respect, according to Doctors Baute and Fisher, had reached the stage that he was compelled to wear a "crutch-type" brace. There was proof, chiefly his own, that he could perform only a light type of labor. However, he was never hospitalized, he never ceased performing certain occupations, and his proven medical expenses, including an estimate for future treatments, came to only $566. Giving Mattingly the benefit of every doubt as regards the extent of his disability, and here we must be governed almost exclusively by the medical evidence which was introduced, we are driven to the conclusion that a major proportion of his impairment was and still is due to the fractures of his two thoracic vertebrae and to the arthritic involvement, which, as has been disclosed, pre-existed the injury he received on September 14, 1953.

A reading of the record convinces us the jury awarded Mattingly damages on the assumption that all his disability arose solely from the injury he received on the railroad. L. & N. cannot be held responsible to Mattingly for his prior injury and diseased condition except to the extent that such disablement was aggravated or extended by the one involved here. See Louisville & N. Railroad Company v. Parsons, 213 Ky. 432, 281 S.W. 519. We have a situation that in our opinion called for an apportionment of Mattingly's impairment that was attributable to the accident. In order to reach such a result a determination of the extent of disability caused by the previous fractures to the thoracic vertebrae and by the arthritis, disconnected with the accidental injury, should have been spelled out. There was a failure of the proof along these lines.

Under the circumstances the verdict in this case strikes us as being disproportionate to the injury Mattingly received as a result of the accident, and we believe it is so excessive as to indicate passion and prejudice on the part of the jury.

Our final conclusion in this case may be thus summarized: The trial court correctly adjudged L. & N. negligent as a matter of law in causing Mattingly's injury. The jury, under a proper instruction, found Mattingly was not contributorily negligent, which finding we hold was amply sustained by the evidence. Since we have determined the damages awarded are excessive, the judgment is set aside to this extent and the case is remanded for a new trial solely as to this issue. Under CR

59.01 we may properly grant a new trial to determine only the damage question. See Kearns v. Sparks, Ky., 296 S.W.2d 731.

Wherefore, for the reason given the judgment is reversed for proceedings not inconsistent with this opinion.