Jean T. Graham, Plaintiff-Appellee, v. Toledo, Peoria and Western Railroad Company, a Foreign Corporation, Defendant-Appellant.

Gen. No. 10,401.

Third District.

May 16, 1962.

Rehearing denied June 18, 1962.

Cassidy & Cassidy, of Peoria, for appellant.

Stamm & Makovic, of East Peoria, for appellee.

REYNOLDS, J.

This is a suit under the Federal Employers' Liability Act for injuries sustained by the plaintiff on June 11, 1955. Plaintiff was employed as a switchman and was a member of a switching crew composed of the engineer Williams, the fireman Schaeffer, the foreman Koeppel, and the switchman and pin puller, Weitz. Williams died prior to the trial and Weitz was out of the country in the military service at the time of the trial. Plaintiff was injured after he had boarded the rear footboard of the switch engine and while he was holding the grab bars on the engine. Plaintiff claims that as the engine proceeded down the track at about 15 to 20 miles per hour, the engineer

applied his brakes using sand so that the engine came to a sudden stop; that as the engine came to a stop he felt a sudden pain in his right shoulder. No one saw the accident but the fireman Schaeffer and the foreman Koeppel saw him a very short time afterwards. He was taken by ambulance to a hospital where he was given sedatives and Dr. Branch, the railroad's surgeon put his arm back in place and bandaged it in a tight sling. He remained in this tight sling for about three weeks, and then the doctor took it off and told him to favor the right arm and use the left. He returned to work the latter part of July and has worked steadily since, losing no time by reason of disability. Plaintiff has been examined every two years in a required physical checkup and about six times in addition to the two year checkup. Plaintiff testified that there are times when his arm and shoulder make a popping noise, that he has bursitis occasionally, and has a kind of grinding, scraping feeling in the joint. Dr. Charles Branch, chief surgeon for the defendant railroad testified he treated the plaintiff and found he had a dislocated shoulder. He reduced the dislocation and bandaged him so that the arm was immobilized at the side and that the patient was kept that way for three weeks. He again examined the plaintiff in 1957. At the 1957 examination plaintiff complained of pain in the right shoulder for three or four weeks and pain at irregular intervals during the past year. Dr. Branch found tenderness over what is called the Subacronial region which is underneath the bone which comes out from the side and underlies the head of the long bone of the arm. X-rays taken then failed to show any evidence of fracture or arthritis. He was given medicine to relieve muscle spasm. Dr. Branch saw the plaintiff about a week later, December 18, 1957, found he was improved to some extent and advised the continued use of the medication.

Dr. H. F. Diller, a physician doing principally industrial surgery, examined the plaintiff May 20, 1958. He found the plaintiff had a 10 to 15 degree loss of abduction, that is, the ability to move the arm away from the body, some atrophy in the right arm, and that the right arm was smaller than the left arm with some shrinkage of tissue in the right arm. Dr. Diller again examined the plaintiff February 2, 1961, at which time he again found the 10 to 15 degree loss of motion in moving the arm away from the body, and found some limitation of internal rotation, that is, plaintiff was unable to place his right hand behind his back as high as his belt line. He also found a slight grating sensation in the arm and shoulder, and found that the atrophy found on the first examination was still present. Dr. Diller took X-rays of the plaintiff's shoulder, but found no bony pathology and no deformity.

Dr. Hugh Cooper, an orthopedic surgeon of Peoria was out of the country, but his report was admitted in evidence. Dr. Cooper found no evidence of muscle atrophy about the shoulder joint. There were no objective findings of any definite pathology, no abnormal limitation of motion in the shoulder joint, nor in the range of motion of the scapula. Dr. Cooper found there was crepitus in the joint. In Dr. Cooper's report, he stated the findings were purely subjective. That X-rays taken of the cervical spine and the shoulder joint were completely negative, so far as any pathology is concerned, and no evidence of any arthritic changes. The doctor's report concluded with the statement that so far as he was able to see, plaintiff had made a complete recovery following a dislocation of the shoulder and had no actual disability at the time of the doctor's examination on October 8, 1959.

The speed of the switch engine at the time of the injury is in dispute. Schaeffer, testified the speed of the engine was about six miles per hour and that there was no sudden stop of the engine. The yard speed for the engine was six miles per hour. Koeppel, foreman of the engine crew, puts the speed of the switch engine at about six miles per hour and also that the stop was a normal stop. Neither Schaeffer or Koeppel saw the plaintiff board the engine and did not know he was hurt until after the engine was stopped.

Plaintiff testified that according to his orders the engine was to come down the ladder track but instead when he saw it it was on what he called the running track. He boarded the engine at the rear so he could get to the cab and find out what the crew was going to do. The testimony showed that he boarded the left rear of the engine, instead of the right side which is customary and that he could not be seen by the engineer on the left side of the engine. Plaintiff stated he was not injured when he boarded the engine, that he was pulled aboard it by the movement of the engine after taking a few steps to get in time with the engine, but that he was injured when he was thrown forward by the sudden stop. Plaintiff further testified that there was no rule about which side the engine could be boarded.

Plaintiff sued under the Federal Employers' Liability Act, for damages in the amount of $15,000 claiming (a) the defendant through its agents and servants was negligent in that it negligently operated and controlled its locomotive (b) operated the locomotive at a speed greater than reasonable, (c) operated its locomotive without keeping a proper and sufficient lookout for traffic and in particular for the plaintiff, and (d) otherwise controlled and operated its loco-

239

motive so it was caused to collide violently with the person of the plaintiff and injure him. Defendant's answer denied negligence and that plaintiff was in the exercise of due care for his own safety. At the close of plaintiff's evidence the court struck sub-paragraphs (c) and (d) of Paragraph 8 of the complaint, so that the matter was submitted to the jury on the grounds that the defendant negligently operated and controlled its locomotive, and, operated the locomotive at a speed greater than reasonable having regard for the traffic and use of the way. The jury found the issues in favor of the plaintiff and assessed his damages in the sum of $15,000. Judgment was entered on the verdict and from that judgment the defendant appeals.

Defendant assigns some seven grounds for reversal, which can be summarized into four points, (1) There was no evidence of negligence on the part of the defendant that even in part caused or contributed to plaintiff's injuries, (2), The judgment is excessive, (3) The court erred in admitting the evidence of Dr. Diller, and (4) The giving of Plaintiff's instruction No. 2 on assumed risk was reversible error.

Taking up the first point it is not in dispute that the plaintiff was injured while in the employ of the defendant. It is not seriously contended that the defendant was not engaged in Interstate Commerce and therefore under the Federal Employers' Liability Act. How plaintiff was injured is a disputed point. Plaintiff claims the speed of the locomotive was 15–20 miles per hour and that the engineer applied the brakes, using sand to facilitate the stopping of the locomotive so that such stopping was sudden, and that he was thus thrown forward, pulling his arm out of its socket. Defendant, by its witnesses, who were part of the train crew, put in evidence that the yard speed for locomotives was six miles per hour, that the en-

240

gine was being operated at a speed of six miles per hour, that there was no sudden stop and that the stop was normal. No one saw the plaintiff board the locomotive and no one saw how he was injured. After the locomotive was stopped, he was found to be hurt and upon being taken to a hospital, the chief surgeon of the railroad found he had a dislocated right shoulder. The plaintiff stated the reason he got on the locomotive was to talk to the foreman to ascertain where the engine was going. The foreman of the train crew testified that plaintiff had no duties to perform on the locomotive. From the plaintiff's testimony and there is nothing to dispute it on that point, he had successfully boarded the locomotive and had a firm hold on the grab bars and rode the engine with such firm hold for about 40 feet. That then the engineer started putting sand on the rails and applying the brakes and that the engine then proceeded about 60 more feet before it stopped. That the engine's sudden stopping threw his body around causing his injury.

■ Defendant argues that there is nothing in this evidence to show negligence in the operation, the stopping of the engine, or its speed. In support of its contention on this point, namely that no negligence on its part had been proved, defendant cites both Federal and Illinois cases. Without going into those cases, it is apparent that a question of fact is presented by the evidence. Admitting that the speed of the engine was not excessive at the time of the injury, it is admitted that the engine was stopped, whether a normal, usual and gradual stop as contended by defendant, or a sudden stop augmented by the application of sand to the rails, as contended by the plaintiff and that when the engine was stopped, the plaintiff was found to have a dislocated shoulder. This is not a bare scintilla of evidence but such evidence that presents a definite question of fact as to

how the injury occurred, and whether the defendant was negligent in its operation of the engine. The fact that the plaintiff got on the left side instead of the right side; that he got on the rear instead of the front; that the engineer did not see him and had no knowledge he was on the engine; that he had a firm hold with both hands on the grab bars; that he admits riding the engine for at least 40 feet before it began to stop, with a firm hold on the bars, and when the engine was stopped he was found to have a dislocated shoulder all point up to the question as to whether the operation and control of the engine by the engineer was such as to constitute negligence. That is not a legal question, but a factual question, and one for the jury to pass upon. It must be admitted that if there is no duty or breach of duty there can be no negligence. Walters v. Christy, 5 Ill App2d 68, 124 NE2d 658. There was a duty on the part of the railroad to operate its engine properly. Whether it breached that duty is a question of fact for the jury to decide, taking into consideration all the various facts that have been presented. The getting on the engine on the left side, on the rear of the engine, the fact that none of the train crew knew he was on the engine, how he was holding on, the fact that he was on the side where the engineer could not see him, all may be some basis for the defendant's theory of contributory negligence on the part of the plaintiff, which would act to mitigate the damages. All these matters go to the ultimate questions that must be decided as factual questions, namely, was the defendant negligent, and did the plaintiff contribute to his injuries. The law as laid down in the case of Finley v. New York Cent. R. Co., 19 Ill2d 428, 167 NE2d 212, at page 433 seems apt here. There the court held that in determining whether a verdict in plaintiff's favor is supported on the record, the sole

242

question is whether there is any evidence, considered in the light most favorable to the plaintiff, that defendant was guilty of negligence which contributed in whole or in part to the injury. Citing Hall v. Chicago & N. W. Ry. Co. 5 Ill2d 135, 125 NE2d 77 and Bonnier v. Chicago, B. & Q. R. Co. 2 Ill2d 606, 119 NE2d 254. And in the Finley case the court quoted from the case of Rogers v. Missouri Pacific Railroad Co. 352 US 500, 506–507, 1 L Ed2d 493, 499, where the United States Supreme Court in commenting on a FELA case said: "Under this statute the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, even the slightest, in producing the injury or death for which damages are sought. It does not matter that, from the evidence, the jury may also with reason, on grounds of probability, attribute the result to other causes, including the employee's contributory negligence. Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all in the injury or death."

Applying the reasoning of that case to the question of negligence of the employer here, this court cannot say that here the evidence is such that without weighing the credibility of the witnesses, and upon considering it in its aspect most favorable to the plaintiff, there can be only the reasonable conclusion that the defendant was not guilty of negligence.

■ The next point raised by the defendant on appeal is that the verdict is excessive. The evidence shows that the plaintiff was unable to work for the period from June 11th to July 25th, 1955, 44 days. His rate of pay then was $125 per week and assuming he lost about six weeks his loss of pay would

be around $750. It is conceded that he has worked steadily since July 25th, 1955, without any loss of time for sickness or injury. The jury's award of $15,000 must be based upon pain and suffering, the claimed limitation of use and atrophy of the arm. While two doctors from their examination found a complete recovery of the injury to the shoulder, another doctor found 10 to 15 degree limitation of motion in moving the arm away from the body and that the plaintiff was unable to place his right hand behind his back as high as his belt line. This doctor found atrophy in the right arm and the right arm to be slightly shrunken. He also found a little crepitus, which is a grating sensation in the arm and shoulder, which he said could be due to roughing of the joint surfaces. This witness, Dr. Diller, examined the plaintiff in 1958 and in 1961. In his opinion the injury was permanent. The company doctor, Dr. Branch, found no evidence of any permanent injury on the occasions he examined the plaintiff. His examinations were when he released plaintiff for work in July 1955, on December 10th and 18th, 1957, and in April 1959. He stated on the latter occasions the plaintiff complained of pain in the arm. He took X-ray pictures but the pictures revealed no permanent injury and his examinations disclosed no limitation of motion of the arm. Dr. Cooper in his statement said that when he examined the plaintiff in October 1959, the plaintiff complained of pain in the arm and shoulder. Dr. Cooper found no evidence of any muscular atrophy, and no objective findings of pathology. He did find there was crepitus in the shoulder joint.

Again we have a factual question which was decided by the jury. The jury apparently decided to give greater weight to the testimony of the plaintiff as to his condition, and the findings of Dr. Diller than to the findings of Dr. Branch and Dr. Cooper.

This the jury had a right to do and this court has no right to interpose its judgment for that of the jury on a factual question. This doctrine has been announced by our courts so many times that a citation of authorities is unnecessary. And, having determined that the plaintiff had a permanent injury, that he had a limitation of use of his arm, that he was in pain and would probably continue to have pain in this arm and shoulder, that there was noticeable atrophy of the muscle, and crepitus in the shoulder joint, the jury assessed his damages at $15,000. The jury found $15,000 to be the proper compensation for the plaintiff for pain and suffering, loss of use of the arm now and in the future. We cannot say that their determination of the amount was wrong.

■ This court can see no merit in the contention of the defendant that the testimony of Dr. Diller should have been stricken. The facts in the case of Jensen v. Elgin, Joliet and Eastern Ry. Co. 15 Ill App2d 559, 147 NE2d 204, are dissimilar. In that case the diagnosis of a ruptured intervertebral disc or a herniated posterior longitudinal ligament was vague and uncertain. In this case, the trial court held that a history of the plaintiff's troubles was not admissible, and that Dr. Diller acted only as an examining doctor. As a matter of connecting up the testimony of Dr. Diller with the injury of the plaintiff, it must be remembered that the defendant put in evidence the findings of doctors testifying for the defense. If the examination and report of Dr. Cooper was admissible, then the testimony of Dr. Diller is also admissible. Defendant cannot have its cake and eat it too. It is true that evidence of causal connection between the claimed injuries and the accident is necessary, but we believe that requirement has been complied with by the evidence.

■ ■ Defendant contends that the trial court erred in giving Plaintiff's Instruction No. 2, which related to the doctrine of assumed risk. While defendant admits this is an IPI instruction, it contends that there was nothing in the pleading or evidence to justify the giving of an assumed risk instruction. The plaintiff contends that the questions asked of the plaintiff as to why he got on the engine on the left side instead of on the right side where he could be seen by the engineer; that he was aware of the general practice of getting on the engine on the right side; that the engineer was not aware he was on the engine; that he boarded the engine traveling at a speed of 15 to 20 miles an hour, and similar questions were all designed to show that the plaintiff assumed the risks of such conduct. The defendant claims it was attempting to show contributory negligence on the part of the plaintiff. The case of Borrero v. Elgin, Joliet & E. Ry. Co. 28 Ill App2d 362, 171 NE2d 673, held that if a defendant in a FELA case, on cross-examination indicated effort to show that the sole cause of plaintiff's injuries was carelessness on the part of the plaintiff, and thus indicated an attempt to develop evidentiary basis for use of defense doctrine of assumed risk by changing its name to contributory negligence, the court did not err in instructing on assumed risk. Here, the trial court was in the best position to determine whether such cross-examination did indicate an effort on the part of the defendant to indicate assumption of risk on the part of the plaintiff, and his giving of the instruction would indicate that he so interpreted the questions of the defendant. The use of such a cautionary instruction is a discretionary matter for the trial court and we do not regard it as reversible error.

■ Finally, the defendant contends that the jury disregarded Defendant's Instruction No. 2 on the is-

sue of contributory negligence. The part of that instruction applicable is in the following language: "Contributory negligence on the part of the injured employee shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee." Such language in effect says to the jury, "if you find the plaintiff contributed to his injury, then you should diminish the amount of his damages in the proportion to which he contributed to his injury." Here, evidently the jury did not find that the plaintiff contributed to his injury.

For the reasons stated, the judgment will be affirmed.

Affirmed.

CARROLL, J., concurs.

ROETH, P. J. took no part in this case.