Paul Henry TOWNSEND and Sharpe
Motor Lines, Appellants,

v.

Lillian STAMPER, Appellee.

Court of Appeals of Kentucky.

Nov. 26, 1965.

Rehearing Denied Feb. 4, 1966.

Charles G. Cole, Jr., Barbourville, for appellants.

Carlos B. Pope, Barbourville, Julian H. Golden, Pineville, for appellee.

DAVIS, Commissioner.

This appeal arises from a collision between the passenger car of Paul Stamper and a tractor-trailer owned by appellant Sharpe Motor Line and driven by appellant Paul Henry Townsend. The appellee, Lillian Stamper, wife of Paul Stamper, was a passenger in her husband's car at the time of the accident. Mrs. Stamper obtained verdict and judgment for $32,100 for personal injuries and medical expenses, alleged to have been caused directly and proximately by the accident. There were two jury trials of the case; at the first trial the jury was not able to reach a verdict.

Appellants enumerate eleven bases for reversal, but we regard them as somewhat repetitious. Hence, we shall summarize the assignments of error as follows: (1) The court should have directed a verdict for appellants at the first trial; (2) the court should have directed a verdict for appellants at the second trial; (3) the court should have granted appellants' motion for a jury panel of 21; (4) the court erred in submitting issue of medical expenses; (5) the verdict is excessive; and (6) the court erred in submitting an instruction on permanent injury.

The accident occurred September 12, 1962, on U. S. Highway 25–E near Barbourville. The Stamper car was proceeding southwardly on 25–E; Mr. Stamper intended to turn left off the highway to go to the city dump. He indicated his intention to make the left turn by activating the electric turn signal about 250 feet from the intersection. It was "dusky dark" at the time of the collision, and both vehicles had on their headlights. Appellant Townsend, operating the tractor-trailer of his employer, appellant Sharpe Motor Lines, was also travelling southwardly and overtaking the Stamper car. Townsend saw the left-turn signal from the Stamper car and assumed that Stamper would complete the indicated left turn. There was no traffic meeting Stamper; the roadway was a two-lane surface, 24 feet in width, with shoulders 9' 9" wide.

According to Stamper, in which he is corroborated by his wife, Townsend raised and lowered the beam of the headlights on the tractor-trailer—rapidly and continuously—as the tractor-trailer continued to overtake the Stamper car. On the other hand, Townsend asserts that he "flicked" the headlights just one time, and that he did so in order to apprise Stamper to go ahead with the left turn. Stamper asserted that he interpreted the flashing of the headlights as a passing signal from the tractor-trailer, and concluded that he could not negotiate the left turn since he supposed the tractor-trailer would be passing his car as he attempted to do so.

Stamper had had experience as a deputy sheriff and as a state police officer, and related that raising and lowering of the headlight beam is a characteristic and usual passing signal at night. Townsend acknowledged that repeated "flicking" of the headlight beam, when accompanied by activation of a left-turn signal, is a passing signal—but he insisted that he gave no such signals.

Stamper testified that he first observed the trailing tractor-trailer as the latter passed another vehicle behind Stamper; that the overtaking tractor-trailer then pulled back into its right lane behind Stamper; that this occurred when the tractor-trailer was about 400 feet behind Stamper. It was just about this time, Stamper said, that he

began to flash his left turn signal. He observed, through his rear view mirror, that the trailing vehicle was gaining on him, and that its lights were being "blinked" as above described. Stamper said that he had slowed somewhat, preparatory to making the left turn, but increased his speed slightly when he concluded that the tractor-trailer was going to pass him. According to Stamper, no portion of his car had ever crossed to the left of the center line—he was about fifty feet short of the left turning point when he concluded he must abandon the left turn. By then, Stamper said, the trailing vehicle had come within three or four feet of his car (although he testified that he realized that an approaching vehicle usually seems to be closer than it actually is). It was just then that the tractor-trailer struck the "extreme right rear corner" of Stamper's car a "glancing lick," then it "dug deeper on the right hand rear door, knocked the rear of my car around and hauled the car forwards and then bump again and crashed, caved the front door in against the front seat," according to Stamper's testimony. When the vehicles came to rest the tractor-trailer was against the guard rail on the extreme right of the road (west side). The Stamper car was on the same side, alongside the tractor-trailer. The left side of the front bumper of the tractor-trailer was "into" the right front door of the Stamper car when the vehicles came to rest.

Witness Jim Howe, a state trooper at the time of the accident, testified that he investigated the wreck. Asked about any statement Townsend had made to him at the scene, he responded:

"Well, first he said he was coming in behind Mr. Stamper and that Mr. Stamper turned his left hand signal on and that he flashed his lights for Mr. Stamper to go head and turn and that instead of turning Mr. Stamper went straight ahead. He cut to the right to pass him on the right hand side and I asked him why he didn't stay behind

him and he said that he was catching up too fast to stay behind him."

Townsend's version of the accident varies from the account given by Stamper. Townsend said that Stamper first turned on his left-turn signal a considerable distance from the accident scene, but then "lifted" the signal (i. e., turned it off). Then, after crossing a bridge, Stamper turned on the left-turn signal again. Townsend was "gaining on" Stamper then, but slowed to about 10 miles per hour. Stamper began the left turn by pulling across the center line, whereupon Townsend "blinked" his lights (for the first and only time, according to Townsend), and "dropped off" onto the right shoulder to pass Stamper. In Townsend's words, this is how the accident happened:

"As I dropped off the road I blinked my lights, one time, and I raised them from high beam back to low, in other words I meant for him to go ahead and complete his turn. When I did that he just gave it a swope (sic), I mean he just cut his car to the right and I just cut mine as far as I could get it. I was in the guard rail and he was right against me."

Mrs. Stamper testified that she was seated alongside her husband in the front seat of the car, with one leg under her and her back against the arm rest on the door. Appellants assert that it was contributory negligence, as a matter of law, for Mrs. Stamper to so position herself—particularly in light of evidence that she had had previous difficulty with her back. No authority for this argument is cited, nor are we able to perceive any basis for it. We conclude that the trial court correctly rejected appellants' contention in this respect.

We think it is apparent that the facts just detailed created a jury issue regarding culpability for the collision. The jury could well believe that Stamper acted as an ordinary prudent man under the circumstances related by him. Townsend ac-

knowledged that he observed Stamper's left-turn signal, and concedes that he did blink his headlights just as Stamper was in the process of turning. His explanation was that he intended the blinking to assure Stamper it was all right to turn. The jury may well have doubted the verity of that explanation, particularly in light of the trooper's testimony. It is significant that KRS 189.340(2), dealing with passing to the right of a left-turning, overtaken vehicle, provides, in part:

> "No person shall drive off the pavement or upon the shoulder of the roadway in overtaking or passing on the right."

We think it is clear that an overtaking vehicle, confronted with a left-turning car ahead, may not proceed as if the left turn and the passing process will be synchronized with the precision of a well-trained drill team. This view of the case disposes of appellants' contentions (1) and (2) respecting a directed verdict for appellants—both at the first and second trials, since the evidence was substantially the same on each trial.

■ Briefly, we deal with the asserted error in not presenting a panel array of twenty-one jurors. Appellants moved the court to present twenty-one jurors, with three peremptory challenges to be accorded Paul Stamper, three to Mrs. Stamper, and three to appellants. At the time of the motion Paul Stamper had pending a cross-claim against appellants for damages allegedly sustained in the accident, and appellants had a claim against Paul Stamper for indemnity or contribution, alternatively. Paul Stamper, by counsel, then dismissed his cross-claim against appellants, although appellants did not dismiss their claims against him. Thereupon the trial court denied the motion for a panel of twenty-one. This was correct. KRS 29.290 assures each party litigant in civil actions the right to three peremptory challenges. Appellants were accorded the right. They may not be heard to complain that Paul Stamper neither sought nor obtained the right to three challenges. Appellants rely on Williams v. Whitaker, Ky., 293 S.W.2d 627, 64 A.L.R.2d 504; Vaughan's Adm'r v. Louisville & N. R. Co., 297 Ky. 309, 179 S.W.2d 441, 152 A.L.R. 1060; Roberts v. Taylor, Ky., 339 S.W.2d 653, and Martin v. Stumbo Elkhorn Coal Co., 216 Ky. 147, 287 S.W. 539. There is no principle in those authorities to support the position of appellants here.

■ The appellants urge that the trial court erred in permitting the jury to award medical expenses; the basis of this contention is that there was a failure to show that the medical expenses were reasonably necessary to the treatment of any injury sustained by appellee in the accident. We deem Miller v. Mills, Ky., 257 S.W.2d 520; Cumberland Quarries, Inc. v. Gibson, 312 Ky. 802, 229 S.W.2d 978, and Louisville & I. R. Co. v. Frazee, 179 Ky. 488, 200 S.W. 948, dispositive of the question. In the case at bar the appellant presented vouchers reflecting payment of various medical expenses. She testified that all were incurred incident to treatment of the injuries she sustained in the accident. An itemized list of the medical expenses was introduced also. This was a prima facie showing of the reasonableness of the bills within the rationale of the cited cases. Appellants made no affirmative challenge of the reasonableness of the medical expenses, although they sought to show that appellee's complaints arose from conditions entirely independent of the accident. Under the evidence adduced the jury had a reasonable basis to conclude that the incurred expenses were for treatment of injuries received by appellee in the accident.

The next question relates to claimed excessive damages. As noted, the total verdict was $32,100. The jury specified in its verdict that the award consisted of $20,000 for pain and suffering, $10,000 for loss of earning power, and $2100 for hospital and medical expense. Consideration of this question requires examination of the nature of the claimed injuries.

Mrs. Stamper had a bout with "back trouble" as early as 1958. At that time she was hospitalized for a few days. X-rays taken of her spine then disclosed an arthritic condition at the interspace between L4–5 vertebrae. Mrs. Stamper gave a history in 1958 of having fallen and hurt her back. The 1958 x-rays disclosed also a condition of osteoporosis (explained by medical evidence as a loss of density or "washing out" of calcium in the bones, frequently encountered in female patients following menopause). Dr. William Patterson examined Mrs. Stamper about ten days after the accident; he and his associate had examined her in 1958. It was Dr. Patterson's view, after the 1962 examination, that Mrs. Stamper had an acute lumbosacral musculoligamentous strain, some of which he ascribed to her obesity (171 pounds) and some of it to her "delay in getting to the hospital" after the accident. He observed some limitation of motion, but was not able to say how much of this was attributable to the automobile accident and how much to arthritic conditions.

Dr. Golden, Mrs. Stamper's personal physician, referred her to Dr. Angelucci at Lexington; the latter is a neuro-surgeon. Dr. Angelucci diagnosed her condition as a probable herniated disc syndrome; he confirmed this diagnosis by means of myelography. Accordingly he performed an operation which revealed a posterior protusion of the mid-line disc at L4–5 interspace, which required its complete removal by having to "go on both sides" of the spine. It was Dr. Angelucci's medical opinion that Mrs. Stamper could return to her duties as a bookkeeper, and he expressed the view that she could and should obtain substantial improvement in her condition if she would follow his directions as to exercise. Dr. Angelucci recognized that a herniated intervertebral disc may develop gradually, or suddenly, but, based upon the history that Mrs. Stamper had given him, it was his opinion that the disc protrusion he found in her was the result of the automobile accident.

Countering this, Dr. Golden told of his treatment of Mrs. Stamper—both before and after the accident. He confirmed her evidence that she had been able to work regularly before the accident, but had not been able to do so following it. (There was evidence that Mrs. Stamper had drawn $60 for twelve days of jury service at the September, 1962, term of the Knox Circuit Court, although it was not developed that she did actually serve on any jury during that time.) Dr. Golden ascribed her present condition to the accident injuries as opposed to any pre-existing conditions. He confirmed her claim of intense pain, and expressed the opinion that her pain was severe and disabling. The following question and answer from Dr. Golden's testimony are pertinent:

"Q 73: Do you have an opinion based on reasonable medical certainty as to the duration or extent of this pain with diagnosis or prognosis of it?

"A: Well, the prognosis for the pain to go away is very poor because of the length of the time, from the time of the operation until now, without any appreciable lessening of the pain, I would doubt that it is going to lessen in the future and I think this will disable in the future."

(The evidence was given at the second trial in January, 1964.)

Dr. Golden further testified that in his opinion Mrs. Stamper was totally disabled as of the time he gave his evidence.

The decisions of this and other courts relating to excessiveness of damages in personal injury cases are legion. See collected cases in 16 A.L.R.2d 3, et seq., and the series of prior annotations on the subject in 102 A.L.R. 1125 and 46 A.L.R. 1230. Supplemental service editions of A.L.R. reflect hosts of cases on the topic since the annotation in 16 A.L.R.2d 3. Our cases have consistently recognized that determination of the propriety of personal injury verdicts depends upon the facts of the particular case and what compensation has

been upheld for similar injuries, giving consideration to changed economic conditions since the precedents were established. Lyon v. Prater, Ky., 351 S.W.2d 173. The same precedent recognizes the equally well-established principle that the test of excessiveness of a damage verdict is whether the award is so great as to strike the mind at first blush as being the result of passion and prejudice. Louisville & N. R. Co. v. Mattingly, Ky., 318 S.W.2d 844, relied on by appellants, is readily distinguishable from the present case on its facts. We simply cannot say that $20,000 as an award for pain and suffering as reflected in this record is so great as to strike the mind at first blush as having been induced by passion or prejudice on the jury's part. The $10,000 awarded for lost earning power appears reasonable, if there was sufficient evidence to warrant a permanent injury instruction.

▉▉▉▉▉ What we have just said, considered in light of the quoted portion of Dr. Golden's testimony, substantially disposes of the question of whether it was proper to instruct the jury on permanent injury. Mrs. Stamper showed that she had earned $200 per month as a bookkeeper for several years before the accident; since the accident she has not been able to work, according to her evidence and according to the evidence of Dr. Golden. As previously noted, Dr. Golden voiced the estimate that her prognosis "for the pain to go away is very poor." He said that he would "doubt that it is going to lessen in the future" and "I think this will disable in the future." It will be noted that Dr. Golden's evidence was not to the effect that he entertained doubt whether Mrs. Stamper will improve—rather he has "doubt" that the pain will lessen in the future, and thinks that the chances are "very poor" for that to happen. As noted in Ingram v. Galliher, Ky., 309 S.W. 2d 763, the evidence as to the permanency of injuries must be shown with reasonable certainty, and must be positive and satisfactory, but not necessarily conclusive. We think the evidence here meets that test.

The judgment is affirmed.